BOUTALL, Judge.
Plaintiff, Louis M. Wattigney, Jr., was awarded $80,000.00 for damages suffered in an automobile collision. The defendant insurance carrier, Government Employees Insurance Company, appealed, contending that the uninsured motorists provisions contained in its policies limits its liability to a lower amount and that the quantum of damages incurred by the plaintiff should be reduced. We affirm.
There is no dispute regarding the accident. On the night of August 7, 1976, Wattigney, Jr., was a passenger in a car owned by his father, Wattigney, Sr. The car was being driven by the plaintiff’s friend, Frank Mule. While going southbound, a car going northbound swung out into their lane resulting in a headon collision causing injuries to the plaintiff and the driver. Wattigney, Jr., was returning to New Orleans from a Mr. Teenage, U.S.A., competition being held in El Dorado, Arkansas. At that contest, he placed second in his class and also won best overall pose.
Plaintiff sued Government Employees Insurance Company based on the accumulation of uninsured motorists limits contained in two policies. At the time of the accident, Wattigney, Sr., owned four vehicles all covered by GEICO. Policy No. 246 — 41—47 listed three cars on its declaration sheet. The effective dates of this policy were August 15, 1975, to August 15, 1976. The car involved in the accident was not listed in this policy but was listed on the declaration sheet of a policy bearing the number 246-41-47-1. The effective dates for that policy were November 6, 1975, to November 6, 1976. GEICO avers that it can list only three cars under one policy number because of its clerical procedures and that the additional “ — 1” on the policy number signifies that this second declaration sheet was only the second page of the original policy. Accordingly, GEICO contends that the fourth vehicle listed on the separate declaration sheet was actually in a companion policy and not a separate policy governed by its own provisions.
We disagree and believe that two separate policies existed with each having its own separate policy limitations. In this instance, Wattigney, Sr., owned three vehicles in July of 1975. He sought coverage through GEICO, which issued policy No. 246 — 41—47. The coverage extended by that policy was for liability limits of $50,000.00. However, Wattigney, Sr., executed a waiver on July 15, 1975, which set the limit for uninsured motorists coverage at $10,000.00 per vehicle. This waiver was made pursuant to R.S. 22:1406D(l)(a), wherein it states:
“No automobile liability insurance covering liability arising out of the ownership, maintenance, or use of any motor vehicle shall be delivered or issued for delivery in this state with respect to any motor vehicle registered or principally garaged in this state unless coverage is provided therein or supplemental thereto, in not less than the limits of bodily injury liability provided by the policy, under provisions filed with and approved by the commissioner of insurance, for the protection of persons insured thereunder who are legally entitled to recover damages from owners or operators of uninsured or underinsured motor vehicles because of bodily injury, sickness, or disease, including death, resulting therefrom; provided, however, that the coverage required under this sub-section shall not be applicable where any insured named in the policy shall reject in writing the coverage or selects lower limits. Such coverage need not be provided in or supplemental to a renewal or substitute policy where the named insured has rejected the coverage or selected lower limits in connection with a policy previously issued to him by the same insurer. Any document signed by the named insured or his legal representative which initially rejects such coverage or selects lower limits shall be conclusively presumed to become a part of the policy or contract when issued and delivered, irrespectively of whether physically attached thereto.”
In November of 1975, some four months after the first policy was in force, Wattig- *1263 ney, Sr., purchased a fourth automobile. GEICO issued policy number 246 — 4147-1 with the policy period beginning on November 6,1975 to November 6,1976. The liability limits for this policy was also set at $50,000.00 but Wattigney, Sr., did not execute a waiver in order to lower his uninsured motorists coverage. The insurer contends that the original waiver is effective on this policy and that the accumulation of coverage amounts to a limit of $40,000.00.
We conclude that the two policies are separate for three reasons: it is physically separate for a newly acquired additional automobile; the policy dates and year are different; GEICO’s notice with the second policy (P-11) states that it is a new separate policy and a separate bill will be sent for each policy. Being a separate policy, the second policy does not fall within the exemptions of the statute afforded to a renewal or substitute policy. The failure of the insurer to obtain a waiver of the required uninsured motorist coverage requires the imposition of the bodily injury limits in accordance with the statute. We further point out that the insurer sent along with the new policy an explanation of UM coverage, including a waiver, which contains the following: “NOTE: Your policy will be issued to comply with Louisiana requirements if this form is NOT returned.”
As a result, the coverage under the uninsured motorists provisions of the new policy was $50,000.00. The trial judge then correctly determined that the total amount of uninsured motorists coverage was $80,-000.00 in accordance with the concept of “stacking” as set out in Seaton v. Kelly, 339 So.2d 731 (La.1976); Graham v. American Casualty Co. of Reading, 261 La. 85, 259 So.2d 22 (1972); and Deane v. McGee, 261 La. 686, 260 So.2d 669 (1972). In Seaton, Justice Dixon stated:
“... that if a plaintiff is an insured under two or more policies, pays premiums or has premiums paid for his benefit for two or more different coverages, he can cumulate the coverages.”
The second question in the matter is in regard to the amount of damages that the plaintiff suffered. The trial judge determined that the plaintiff sustained injuries and damages far in excess of the amount of GEICO’s liability. While we disagree with that determination to the extent that we consider the award generous, we cannot say it is excessive or manifestly erroneous.
When plaintiff was injured on August 7, 1976, he was taken to a local hospital where he was treated by Dr. C. E. Tommey, a general surgeon. Dr. Tommey concluded that the plaintiff suffered a large, rugged laceration in the middle of the forehead, extending all the way across the left forehead to the hairline as well as small superficial lacerations on the lower portion of the face and hands. Plaintiff also suffered a severe contusion of the chest. His wounds were cleaned and stitched and he received some drugs for pain and a tetanus booster for any possible infection.
Several days after the plaintiff returned home, he went to see Dr. William Terral, his family doctor. Dr. Terral redressed the wound several times over the next couple of weeks and finally removed the sutures on August 21. Later on October 2, Dr. Terral made a small incision and drained the ab-cess that had formed on his forehead because of an infection that had set in.
In November of 1976, plaintiff saw Dr. Kenneth Dieffenbach, a plastic surgeon, because of problems relating to the laceration on his forehead. Dr. Dieffenbach performed surgery on November 12, and concluded that the plaintiff would probably never recover full sensation in that area. He also believed that the plaintiff should not return to body building for at least one year and only then if the plaintiff should have no complaints of headaches or visual disturbances.
The plaintiff later went to see Dr. Albert Fant, a psychiatrist, in August and September of 1977. Dr. Fant believed that the plaintiff suffered from a depression which was a reaction to the accident. The plaintiff also saw Dr. William Sorum, a psychiatrist, in February of 1978, and he concluded that the plaintiff was still depressed be *1264 cause of the accident. The plaintiff later testified at trial that he was seriously considering making body-building a profession and eventually opening up a health spa; but, as a result of the accident, he felt that this was impossible. Drs. Fant and Sorum concluded that the change in his plans of going into body building as a profession also contributed to his depression. However, both doctors believed that the plaintiff would be cured within a short period of time.
We have outlined the medical course of plaintiff’s injuries to demonstrate that the direct injuries and resulting disabilities are not by themselves the dominant factors upon which the award of $80,000.00 was based. The award does not include medical bills, which had been previously paid by defendant. The reasons for judgment given by the trial judge indicates that he must have granted a considerable sum because the injuries interfered and prevented the plaintiff from continuing his body building career.
As noted, plaintiff was injured while returning from a competition in the Mr. Teenage, U.S.A., contest. He was eighteen years old and had engaged in body building for several years prior to the contest, which was nationwide in scope and a highly coveted prize in the body building field. He was adjudged to be in first place in the “best pose” catagory of the contest and was awarded second place overall. Plaintiff had intended to continue his program and compete again the next year, the last year for which he would be eligible, with the hope of taking first place and being named Mr. Teenage, U.S.A. Based upon the achievements that he had already accomplished, together with whatever titles he may acquire in the future, he had hoped to start a career in body building. While there is no proof in this record as to the financial benefits to be derived from winning such a title, and it is speculative to say that he would have made more money in such a profession than he is presently making in his employment as a tugboat captain, nevertheless we are confronted with a young man who had the means of achieving prominence in this field, and whose efforts of several years of hard work plus his dreams of the future have been devalued and curtailed by this automobile collision.
The course of the treatment was not smooth, and plaintiff had problems with the healing of his lacerations that caused him considerable pain. In particular, the gash on his forehead had caused significant amount of tissue loss and because of its poor healing propensity, had to be revised. That wound had severed the supra orbital nerve and caused a numbness to the left side of plaintiff’s head. This was further described as a feeling that the area was heavy or dead and not alive, and caused discomfort in the nature of “pins and needles”. Because of these conditions, plaintiff was advised not to lift weights, and he began to suffer from depression. Plaintiff had been described by Dr. Terral, who had treated him since he was a baby, as a person who did not have any emotional or psychological problems but was always considered to be a stable young man. Because of the many problems presented by his injuries, the plaintiff became depressed, which forever dissuaded him from attempting any body building.
It is extremely difficult to place a precise valuation upon the damages suffered in a case like this. Louisiana Civil Code Article 1934(3) grants the judge much discretion in the assessment of damages in such cases. We are disposed to grant to the plaintiff in this case a higher amount of award than would ordinarily be granted to a person who was simply prevented from pursuing a hobby or some recreational pursuit. Bearing in mind that this individual worked very hard for several years at body building, that he had achieved a high plateau of recognition in this field, and that he was prevented from pursuing his endeavors further, we cannot say that the trial judge erred in making the award that he did. For us to reduce the amount of the award would simply constitute the substitution of our opinion for that of the trial judge and would be in violation of the principles set *1265 out in the cases of Coco v. Winston Industries, Inc., 341 So.2d 332 (La.1977) and Reck v. Stevens, 373 So.2d 498 (La.1979).
Accordingly, we affirm the judgment appealed.
AFFIRMED.